[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14889
_____

D.C. Docket No. 9:14-cv-80781-RLR


EDWARD LEWIS TOBINICK, MD,
a medical corporation, d.b.a the Institute of Neurological Recovery,
INR PLLC,
a Florida professional limited liability company, d.b.a. Institute of Neurological
Recovery,
M.D. EDWARD TOBINICK,
an individual,

Plaintiffs - Appellants,

versus

STEVEN NOVELLA,
an individual,
SOCIETY FOR SCIENCE-BASED MEDICINE, INC.,
a Florida Corporation,
SGU PRODUCTIONS, LLC,
a Connecticut limited liability company, et al.,

Defendants - Appellees,

YALE UNIVERSITY,
a Connecticut corporation, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(February 15, 2017)

Before HULL and MARTIN, Circuit Judges, and RESTANI,[*] Judge.

RESTANI, Judge:

Appellants Edward Lewis Tobinick, MD ("INR CA"), INR PLLC ("INR FL"), and M.D. Edward Tobinick ("Dr. Tobinick") (collectively, the "Tobinick Appellants") appeal the district court's orders striking INR CA's state law claims pursuant to California's anti-SLAPP statute, twice denying amendment of the Tobinick Appellants' complaint, denying relief pursuant to Federal Rules of Civil Procedure ("Rule") 37, 56(d), and 60 due to potential discovery-related abuses, and granting summary judgment against the Tobinick Appellants on their Lanham Act claim. We affirm the district court in all respects.

## BACKGROUND

This case concerns a dispute between two doctors regarding the medical viability of a novel use for a particular drug.

## I.    The Parties

_____

[*] Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

Dr. Tobinick is certified in internal medicine and dermatology, and he is licensed in both California and Florida. He has two clinics that conduct business as The Institute of Neurological Recovery: INR CA in Los Angeles, California, and INR FL in Palm Beach County, Florida. Dr. Tobinick has developed an unorthodox use for the drug etanercept by delivering it through perispinal administration, which involves a needle injection near particular spinal ligaments. Dr. Tobinick claims that this new use of etanercept is effective at treating spinal pain, post-stroke neurological dysfunctions, and Alzheimer's disease. Etanercept is the generic name of Enbrel, which was first approved by the United States Food and Drug Administration ("FDA") in November 1998 to treat rheumatoid arthritis. Notably, Enbrel has not been FDA approved for the purposes which Dr. Tobinick seeks to use the drug.

Steven Novella ("Dr. Novella") is a neurologist at Yale New Haven Hospital in the Botulinum Program and treats patients with a variety of conditions, including headaches, back pain, Alzheimer's disease, dementia, and seizures. Dr. Novella also engages in endeavors apart from these professional obligations. For instance, he is on the board of the non-profit Society for Science-Based Medicine, Inc. ("Society"). In addition, in May 2005, Dr. Novella began working with his brother, Jay Novella ("Jay"), to produce and broadcast a podcast that discusses a variety of scientific issues. This podcast, "The Skeptics Guide to the Universe," is hosted on

3

a website (www.theskepticsguide.org) owned by the for-profit company SGU Productions, LLC ("SGU").  Also, Dr. Novella is the executive editor of and contributor for the Science-Based Medicine ("SBM") blog (www.sciencebased medicine.org), which examines issues related to science and medicine, and is operated by a non-profit entity, the New England Skeptical Society.[1]

## II.    Factual Background

In response to a May 5, 2013, Los Angeles Time article discussing Dr. Tobinick's novel treatments, Dr. Novella published an article "Enbrel for Stroke and Alzheimer's" in SBM's blog on May 8, 2013 (the "first article").  In this six-page article, Dr. Novella explains that he learned of the Los Angeles Time article, the typical characteristics of "quack clinics" or "dubious health clinics," the key features of Dr. Tobinick's clinic, and lastly the plausibility of and the evidence supporting Dr. Tobinick's allegedly effective use of etanercept.  Particularly relevant to this case, Dr. Novella also quotes a portion of the Los Angeles Time article, which reported that "[Dr. Tobinick's] claims about the back treatment led to an investigation by the California Medical Board, which placed him on probation for unprofessional conduct and made him take classes in prescribing practices and

---

[1] The Society is a separate entity from the SBM blog.  The Society has its own website that was first made available to the public on January 1, 2014.

ethics." Am. Compl. Ex. 1 at 3, <u>Edward Lewis Tobinick, MD v. Novella</u>, No. 9:14-cv-80781-RLR (S.D. Fla. Aug. 1, 2014), ECF No. 55 ("Am. Compl.").

On June 9, 2014, the Tobinick Appellants filed a complaint against Appellees Dr. Novella, the Society, SGU (collectively, the "Novella Appellees"), and also Yale University ("Yale"), challenging Dr. Novella's first article. In response to the lawsuit and on July 23, 2014, Dr. Novella published another article in SBM's blog entitled "Another Lawsuit To Suppress Legitimate Criticism – This Time SBM" (the "second article"). In the second article, Dr. Novella details the lawsuit filed by the Tobinick Appellants and provides Dr. Novella's view that the lawsuit is designed to silence his public criticism of Dr. Tobinick's practices. He also restates in large part his same criticisms of Dr. Tobinick's practices as set forth in the first article. In doing so, Dr. Novella again mentions the Medical Board of California ("MBC")'s investigation into Dr. Tobinick's practices, explains that the MBC "filed an accusation in 2004, amended in 2005 and 2006," and lists in detail the different allegations made in the 2004 Accusation against Dr. Tobinick. Am. Compl. Ex. 5 at 3–4.[2]

---

[2] The Society's website also contains a short entry about Dr. Tobinick's use of etanercept. The entry discusses the MBC's 2006 Second Amended Accusation and subsequent settlement and Dr. Novella's criticism of Dr. Tobinick. The entry also links to Dr. Novella's entire article on the SBM blog.

## III.    Course of Proceedings

As stated above, the Tobinick Appellants filed their initial complaint on June 9, 2014.  On June 11, 2014, the Tobinick Appellants moved for a preliminary injunction to enjoin the Novella Appellees from continuing to display the articles.  On August 1, 2014, the Tobinick Appellants filed an amended complaint to add allegations relating to the second article that was published just nine days prior.  This operative amended complaint contests several aspects of the first article, including claims that these neurological conditions "not known to be immune mediated [can be] treated by a specific immunosuppressant,"[3] claims that Dr. Tobinick's retrospective case studies are not probative medical evidence, implications that Dr. Tobinick is committing a health fraud, statements that Dr. Tobinick's clinics are "a one-man institute," and that Florida is a "very quack-friendly state."  Am. Compl. ¶¶ 54, 60, 63, 69, 71.  Regarding the second article, the Tobinick Appellants' operative complaint specifically takes issue with only one new statement therein, that "there have been no double-blind placebo-controlled clinical trials of the treatment provided by [Dr. Tobinick]."  Am. Compl. ¶ 102.  These disputes are covered in the operative complaint by the following causes of

---

[3] According to Dr. Novella, his statement that the neurological conditions treated by Dr. Tobinick are "not known to be immune mediated" means "that the current consensus is not that these conditions are primarily caused by or driven by an autoimmune disease that could be modified by this treatment."  Dep. of Steven Novella, M.D., at 35–36, Edward Lewis Tobinick, MD v. Novella, No. 9:14-cv-80781-RLR (S.D. Fla. Sept. 1, 2015), ECF No. 261-9.  Dr. Novella identified etanercept as an example of an immunosuppressant.  Id.

action:  violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count I); common law unfair competition (Count II); trade libel (Count III); libel per se (Count IV); and tortious interference with business relationships (Count V).

On August 8, 2014, and August 13, 2014, SGU and Yale, respectively, moved to dismiss the action as to them for lack of personal jurisdiction.  On August 11, 2014, Dr. Novella moved to dismiss all claims against him for various reasons. On August 18, 2014, the Society moved to dismiss the action against it for failure to state a claim, or for summary judgment, because, inter alia, the Society did not engage in false advertising under the Lanham Act.

On September 25, 2014, pursuant to SGU's and Yale's motions to dismiss for lack of personal jurisdiction, the district court dismissed each from the case.  On September 30, 2014, Dr. Novella invoked California's anti-SLAPP law[4] and moved to strike the only California plaintiff's, INR CA's, state law claims.  On January 23, 2015, the district court denied Dr. Novella's motion to dismiss in nearly all respects but granted his motion to dismiss Count V of the amended complaint, i.e., the tortious interference claim, because Florida's single publication rule barred that claim.  The Tobinick Appellants do not challenge this dismissal on appeal.

---

[4] The purpose of the anti-SLAPP law is to curb the "increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." See Cal. Civ. Proc. Code § 425.16(a).  Such causes of action are subject to a special motion to strike. Id. § 425.16(b)(1).

On March 16, 2015, after converting the Society's motion to dismiss into a motion for summary judgment, the district court granted summary judgment in favor of the Society with respect to the Lanham Act (Count I) and the unfair competition (Count II) claims, explaining that the articles were not commercial speech.  The district court also dismissed without prejudice the trade libel (Count III) and libel per se (Count IV) claims against the Society because the Tobinick Appellants failed to properly notice the Society of these claims as required by Florida law.  The district court, therefore, dismissed the Society from the action, but it did provide the Tobinick Appellants leave to re-file their claims against the Society in a separate suit.[5]  On April 2, 2015, following limited discovery, the district court denied the Tobinick Appellants' motion for a preliminary injunction.

On May 11, 2015, the deadline for amended pleadings, the Tobinick Appellants moved for leave to file a second amended complaint, adding new factual allegations some of which related to new webpages and a podcast that discussed Dr. Tobinick,[6] raising a new claim for common law civil conspiracy, re-

---

[5] On appeal, the Tobinick Appellants do not explicitly challenge the order granting summary judgment in favor of the Society.  Their discovery-related requests for relief could be generously construed as a challenge to the validity of this summary judgment order.  But, because we conclude that the district court did not abuse its discretion in denying the requests for discovery-related relief, we see no remaining challenge to the grant of summary judgment in favor of the Society.

[6] More precisely, the Tobinick Appellants add allegations regarding (1) a July 23, 2014, legal defense webpage on SGU's website, which requests donations to help defend against the Tobinick Appellants' suit, (2) a July 26, 2014, SGU podcast that discusses Dr. Tobinick's

(continued . . . )

8

asserting claims against the previously-dismissed defendant SGU, and inserting two new defendants—Jay and Paul Ingraham ("Ingraham"), a co-blogger of Dr. Novella. On May 15, 2015, the Tobinick Appellants filed a corrected version of their motion for leave to amend.

On June 4, 2015, the district court granted Dr. Novella's special motion to strike INR CA's state law claims ("anti-SLAPP order"). On June 18, 2015, the district court issued an omnibus order denying the Tobinick Appellants' corrected motion for leave to file a second amended complaint. In that omnibus order, the district court also granted Dr. Tobinick's and INR FL's request for voluntary dismissal of Counts III and IV for trade libel and libel per se, respectively. Shortly thereafter, on June 25, 2015, Dr. Novella filed his answer to the operative amended complaint.

On August 18, 2015, the Tobinick Appellants again moved for leave to file another second amended complaint in order to add a claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). On August 20, 2015, the district court denied the Tobinick Appellants' motion.

On August 25, 2015, Dr. Novella moved for summary judgment on all remaining claims. On September 1, 2015, the Tobinick Appellants filed two

medical treatments, the transcript of which was published on August 7, 2014, and (3) an April 1, 2015, article in SBM's blog that provided an update on the status of the litigation against the Tobinick Appellants.

motions based on the allegation that Dr. Novella provided false deposition testimony, one motion pursuant to Rule 37 seeking sanctions and one pursuant to Rule 60(b) seeking reconsideration of the district court's anti-SLAPP order.  The Tobinick Appellants argued that Dr. Novella falsely denied that he had communicated with the author of the May 5, 2013, Los Angeles Times article; denied that he had ever discussed Dr. Tobinick with Ingraham; and denied communicating with another physician, Stephen Barrett, regarding Dr. Tobinick.

On September 15, 2015, the district court denied each of the Tobinick Appellants' motions based on the alleged discovery-related abuses.  On October 2, 2015, the district court found that Dr. Novella's speech is not commercial and then granted summary judgment in favor of Dr. Novella on both remaining claims.  The district court reasoned that the Tobinick Appellants largely based their unfair competition claim (Count II) on their Lanham Act false advertising claim (Count I).  The Tobinick Appellants now appeal.

### JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction of this appeal pursuant to 28 U.S.C. § 1291.  We review de novo "the district court's interpretation and application of a statute" such as California's anti-SLAPP statute.  Royalty Network, Inc. v. Harris, 756 F.3d 1351, 1354 (11th Cir. 2014).  We review for an abuse of discretion the district court's denial of leave to amend and the denial of requests for relief brought under

10

Rules 37, 56(d), and 60(b).  World Holdings, LLC v. Fed. Republic of Germany, 701 F.3d 641, 649, 654–55 (11th Cir. 2012) (Rule 56(d)); Garfield v. NDC Health Corp., 466 F.3d 1255, 1270 (11th Cir. 2006) (leave to amend); Serra Chevrolet, Inc. v. Gen. Motors Corp., 446 F.3d 1137, 1146–47 (11th Cir. 2006) (Rule 37); Cox Nuclear Pharmacy, Inc. v. CTI, Inc., 478 F.3d 1303, 1314 (11th Cir. 2000) (Rule 60(b)).

Further, we review a grant of summary judgment de novo, "viewing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in favor of that party."  McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1141 (11th Cir. 2014).  "Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Id.

## DISCUSSION

### I.  Dr. Novella's Special Motion to Strike

The Tobinick Appellants challenge the district court's anti-SLAPP order on two grounds.  First, the Tobinick Appellants contend that the district court erred in adopting the anti-SLAPP expedited procedures because doing so "trampled federal procedure and constitutional rights" and violated the doctrine of Erie R. Co. v. Tompkins, 304 U.S. 64 (1938).  Second, the Tobinick Appellants argue the district court's determination that there was no evidence of actual malice by Dr. Novella is

11

erroneous.  Dr. Novella responds that the Tobinick Appellants waived their Erie claim and, in the alternative, that the district court did not err on the merits of that claim.  Dr. Novella also avers that the Tobinick Appellants fail to point to evidence of actual malice.

## A.    Waiver of Erie Claim

We do not consider an issue "not raised in the district court and raised for the first time in an appeal."  Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004) (quoting Walker v. Jones, 10 F.3d 1569, 1572 (11th Cir. 1994)).  We have recognized exceptions to the waiver doctrine, including, inter alia, where there is a:  (1) "pure question of law, and if refusal to consider would result in a miscarriage of justice[,]" or (2) "no opportunity to raise [the objection] at the district court level."  Id. at 1332 (quoting Wright v. Hanna Steel Corp., 270 F.3d 1336, 1342 (11th Cir. 2001)).

The Tobinick Appellants waived their challenge to the district court's application of California's anti-SLAPP statute based on the Erie doctrine.  The Tobinick Appellants did not raise the Erie claim in their response to Dr. Novella's special motion to strike INR CA's state law claims, nor do the Tobinick Appellants now contend that they ever raised the issue before the district court.  Moreover, when asked by the district judge "what about the issue of anti-SLAPP statutes applying in diversity cases in federal court?" the Tobinick Appellants' counsel

12

responded "[t]here seems to be a plethora of case law that suggests that it is allowable in diversity actions in federal court." Tr. of Mot. Hr'g, at 26, Edward Lewis Tobinick, MD v. Novella, No. 9:14-cv-80781-RLR (S.D. Fla. Nov. 20, 2014), ECF No. 113. The Tobinick Appellants, therefore, waived the issue. See, e.g., NCDR, L.L.C. v. Mauze & Bagby, P.L.L.C., 745 F.3d 742, 753–54 (5th Cir. 2014) (deeming waived party's argument that Texas' anti-SLAPP statute conflicts with the certain federal Rules).

No exception to waiver saves the Tobinick Appellants' claim. The Tobinick Appellants have not identified any miscarriage of justice resulting from a finding of waiver, nor do we see one, given the weakness of the Tobinick Appellants' state law claims.[7] Furthermore, not only did the Tobinick Appellants squarely concede the Erie issue at the hearing, the district court nevertheless considered the argument in its anti-SLAPP order. The district court acted reasonably in applying California's anti-SLAPP statute to the state law claims, stating that "the majority of circuit courts have found anti-SLAPP special motions to strike permissible, and . . . the specific anti-SLAPP statute at issue has previously been allowed in federal court." Edward Lewis Tobinick, MD v. Novella, 108 F. Supp. 3d 1299, 1305 n.4 (S.D. Fla. 2015) ("Tobinick"). Moreover, that the Seventh Circuit's June 29, 2015,

---

[7] As reflected in the discussion of actual malice, infra, it seems highly unlikely that the Tobinick Appellants' state law claims would survive even without the availability of an anti-SLAPP motion.

decision in Intercon Solutions, Inc. v. Basel Action Network, on which the Tobinick Appellants rely, had not been issued until after the district court issued its June 4, 2015, anti-SLAPP order does not excuse the Tobinick Appellants' waiver. See 791 F.3d 729, 731–32 (7th Cir. 2015) (holding that Washington's anti-SLAPP statute was inapplicable in federal court after that state's highest court interpreted that anti-SLAPP statute as going beyond a summary judgment procedure and as violating the right to a trial by a jury by requiring a judge to make factual findings).

First, Intercon is obviously of limited applicability.  Second, notwithstanding the date of the Intercon decision, the Tobinick Appellants explicitly conceded the Erie issue at the hearing in which Dr. Novella's counsel alerted the district court of that potential issue.  Even more telling, the Tobinick Appellants did not raise the Erie issue in their September 1, 2015, motion for reconsideration of the district court's anti-SLAPP order, which was filed months after Intercon had been decided. Accordingly, we decline to consider the merits of the Tobinick Appellants' Erie-based challenge for the first time on appeal.

## B.   Actual Malice

In applying California's anti-SLAPP statute,[8] the district court reasoned that Dr. Tobinick was a limited public figure[9] and that he had not produced evidence of

---

[8] The anti-SLAPP statute provides:

(continued . . . )

14

actual malice such that INR CA, Dr. Tobinick's California entity, had a probability

of prevailing on its state law claims. Tobinick, 108 F. Supp. 3d at 1308, 1309; see

Cal. Civ. Proc. Code § 425.16(b)(1). The Tobinick Appellants challenge only the

latter holding regarding actual malice.

Actual malice is defined as "with knowledge that [a statement] was false or

with reckless disregard of whether it was false or not" and must be shown "by clear

and convincing evidence." Reader's Digest Ass'n, Inc. v. Superior Court, 690

P.2d 610, 617 (Cal. 1984) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 280

(1964)). To show reckless disregard for truth or falsity, California courts apply a

subjective test in which "[t]here must be sufficient evidence to permit the

conclusion that the defendant in fact entertained serious doubts as to the truth of

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

Cal. Civ. Proc. Code § 425.16(b)(1).

[9] As we have explained, the Supreme Court has identified two types of public figures in this context. An all-purpose public figure is one that "occup[ies] positions of such persuasive power and influence that they are deemed public figures for all purposes." Silvester v. Am. Broad. Cos., 839 F.2d 1491, 1494 (11th Cir. 1988) (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974)). A limited public figure, by contrast, "ha[s] thrust [himself] to the forefront of particular public controversies in order to influence the resolution of the issues involved." Id. (quoting Gertz, 418 U.S. at 345). Both types of public figures must prove that the defamatory statements were made with actual malice. See Gertz, 418 U.S. at 336; Reader's Digest Ass'n, Inc. v. Superior Court, 690 P.2d 610, 615 (Cal. 1984) ("Unlike the 'all purpose' public figure, the 'limited purpose' public figure loses certain protection for his reputation only to the extent that the allegedly defamatory communication relates to his role in a public controversy.").

15

his publication." Id. at 617–18 (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968)). California courts consider factors such as "[a] failure to investigate, anger and hostility toward the plaintiff, [and] reliance upon sources known to be unreliable or known to be biased." Id. at 618–19 (citations omitted); see Christian Research Inst. v. Alnor, 55 Cal. Rptr. 3d 600, 612 (Cal. Ct. App. 2007).

The Tobinick Appellants have not presented evidence that rises to the level of actual malice. The Tobinick Appellants believe there is actual malice because (1) Dr. Novella improperly relied on the MBC's 2004 Accusation, which had been superseded by a 2006 Second Amended Accusation, (2) Dr. Novella provided false declarations to the district court because one declaration indicates that, in researching the articles, Dr. Novella relied on the MBC's 2004 Accusation and other declarations state he relied on the MBC's 2006 Second Amended Accusation, (3) the articles contained false statements, such as claiming Dr. Tobinick ran a "one-man institute," and (4) Dr. Novella's deposition included false testimony regarding communications with certain third-parties. Here, even all of the Tobinick Appellants' circumstantial evidence taken as true is insufficient to show that Dr. Novella had serious doubts as to the truth of the content contained in his two articles.

Contrary to the Tobinick Appellants' arguments, the evidence indicates that Dr. Novella consulted both the MBC's 2004 Accusation and the 2006 Second

16

Amended Accusation. We see no reason why the fact that Dr. Novella consulted the 2006 document precludes him from having also consulted the 2004 document. Notwithstanding the alleged discrepancy, the Tobinick Appellants are unable to point to a definitively false statement in either of Dr. Novella's articles stemming from the reliance on the 2004 Accusation.[10] Instead, Dr. Novella's second article explicitly acknowledges that the MBC's 2004 Accusation was amended in 2006, thereby laying credence to the belief that Dr. Novella had seen both documents.

Similarly, the allegedly false statements in Dr. Novella's articles and the inconsistencies in his deposition testimony are insufficient to demonstrate actual malice. Neither speaks to whether Dr. Novella was "aware of any erroneous statements or [was] in any way reckless in that regard" when he wrote the articles. Sullivan, 376 U.S. at 286. The mere existence of a false statement does not, on its own, demonstrate Dr. Novella's knowledge of its falsity. Tellingly, the Tobinick Appellants are unable to show that many of Dr. Novella's statements are actually

---

[10] The Tobinick Appellants do state that both the 2004 Accusation and the 2006 Second Amended Accusation were superseded by an MBC 2007 Decision adopting a Stipulated Settlement and Disciplinary Order, which recognized that "studies . . . have provided evidence that perispinal etanercept is effective for treatment of disc-related pain." Pls.' Corrected Rule 60(b) Mot. for Relief from June 4, 2015 Order and Sanctions and Incorporated Mem. of Law Ex. 29, at 4, Edward Lewis Tobinick, MD v. Novella, No. 9:14-cv-80781-RLR (S.D. Fla. Sept. 1, 2015), ECF No. 261. The Tobinick Appellants do not identify which of Dr. Novella's statements is in conflict with this settlement; instead, they seems to imply that Dr. Novella's articles are misleading as to existence of these studies incorporated in the MBC's 2007 Decision. Not only is this implication on its own insufficient to rise to the level of actual malice, but Dr. Novella's second article appears to reference these very studies. The second article admits that "[t]here are small studies for disc herniation showing conflicting results." Am. Compl. Ex. 5 at 3.

17

false or that they are anything more than medical or personal opinion. As an example, the Tobinick Appellants rely on Dr. Novella's characterization of Florida as a "very quack-friendly state," Am. Compl. ¶ 71, but this statement is plainly Dr. Novella's opinion and cannot be proven as true or false. The Tobinick Appellants, instead, point to isolated statements, which do not pertain to the article's essential criticism of Dr. Tobinick's medical practices, as evidence that Dr. Novella recklessly included falsities in the article. But, this evidence at most demonstrates mere negligence and does not raise to the level of reckless disregard needed to prove actual malice. See Sullivan, 376 U.S. at 271–72 ("[E]rroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need to survive[.]'"). For instance, the Tobinick Appellants allege that Dr. Novella "falsely implies" that Dr. Tobinick's clinics "have committed a health fraud insomuch as the [first article] was placed into a category identified as 'Health Fraud.'" Am. Compl. ¶ 63. The article itself, however, never states that Dr. Tobinick is committing or has committed health fraud. And, placement in a category on a website is insufficient here where there is no evidence that Dr. Novella decided in which category the article would be included. Furthermore, regarding the "one-man institute" comment, the Tobinick Appellants have failed to rebut Dr. Novella's statement that he looked at the websites for Dr. Tobinick and his clinic and "Dr. Tobinick [was] the only

18

physician named and profiled on the websites." Def. Dr. Steven Novella's Mot. to Dismiss Ex. 1, ¶ 30, Edward Lewis Tobinick, MD v. Novella, No. 9:14-cv-80781-RLR (S.D. Fla. July 23, 2014), ECF No. 36. Dr. Novella's statement is reasonably held, as the name of Dr. Tobinick's California clinic, "Edward Lewis Tobinick, MD," further supports his belief that "Dr. Tobinick was a solo practicioner[.]" Id. Instead, as the district court acknowledged, Dr. Novella's articles contain "a more nuanced discussion of the issues than [INR CA's] pleading admits." Tobinick, 108 F. Supp. 3d at 1311.

As to the allegedly false statements in the deposition testimony, they relate primarily to Dr. Novella's communications with certain third-parties after the first article had been published and do not speak to Dr. Novella's knowledge of the accuracy of the statements made in either of his articles. In any event, as discussed infra, the Tobinick Appellants' challenges to Dr. Novella's allegedly false deposition testimony are based on mere conjecture and, if true, at most demonstrate ill will towards Dr. Tobinick, likely based on differing views on medical matters. See Reader's Digest Ass'n, 690 P.2d at 619 ("[M]ere proof of ill will on the part of the publisher may . . . be insufficient [to prove actual malice].").

Moreover, although "[t]he failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice," id. at 619, we conclude that the evidence of Dr. Novella's investigation, in which he looked to

19

trustworthy sources, demonstrates his lack of subjective belief that the articles contained false statements.  Before writing, Dr. Novella consulted the <u>Los Angeles Times</u> article, many of Dr. Tobinick's case studies, the MBC's accusations, and the Tobinick Appellants' own websites.  See <u>Tobinick</u>, 108 F. Supp. 3d at 1310. Accordingly, because the Tobinick Appellants have not demonstrated a probability of success on the actual malice issue, the district court did not err in granting Dr. Novella's special motion to strike the state law claims pursuant to California's anti-SLAPP statute.

## II.     The Tobinick Appellants' Motion for Leave to Amend

The Tobinick Appellants argue that the district court erred in twice denying them leave to amend the operative complaint because there would not have been prejudice to the Novella Appellees.

Rule 15 provides that "[a] party may amend its pleading once as a matter of course . . . ."  Fed. R. Civ. P. 15(a)(1).  And "[i]n all other cases, a party may amend its pleading only with . . . the court's leave.  The court should freely give leave when justice so require."  <u>Id.</u> 15(a)(2).  The Supreme Court has explained that a district court may properly deny leave to amend for reasons "such as undue delay."  <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962).

The district court did not abuse its discretion in twice denying leave to amend the operative complaint.  Both motions for leave to amend were sought

20

approximately a year after the Tobinick Appellants filed the original complaint. By the time the Tobinick Appellants sought amendment, the course of proceedings had been markedly advanced—the district court had dismissed SGU and Yale for lack of personal jurisdiction, dismissed Count V of the operative complaint, granted summary judgment in favor of the Society, and denied the Tobinick Appellants' motion for preliminary injunction. The Tobinick Appellants filed the first motion for leave to amend on the deadline for amended pleadings and sought extensive changes to the operative complaint: they alleged new factual allegations, added a civil conspiracy claim, reinserted previously-dismissed SGU back into the case, and added two new defendants. The second motion to amend also sought to supplement the complaint with the new FDUTPA cause of action.

In denying the first motion, the district court reasonably concluded that allowing amendment "would essentially reset the case." Omnibus Order, at 2, Edward Lewis Tobinick, MD v. Novella, No. 9:14-cv-80781-RLR (S.D. Fla. June 18, 2015), ECF No. 202. The district court noted the "aggressively litigated" course of proceedings, the extent of the amendments sought by the Tobinick Appellants, and the fact that the Tobinick Appellants "could only identify a limited number of recent statements incorporated into the proposed" complaint. Id. at 1–2. Indeed, many of the new factual allegations added by the Tobinick Appellants related to the legal defense webpage and the SGU podcast, which were both

21

initially published in July 2014, nearly a year before the Tobinick Appellants filed their first motion for leave to amend.  Similarly, the district court denied the second motion, which was filed <u>after</u> the deadline for amended pleadings, in a docket entry "for all of the reasons previously stated on the record at the Court's Status Conference on June 18, 2015, as well as the timing of the Motion in relation to the dispositive motion deadline, which is imminent, and trial, which is two months hence."  Paperless Order, <u>Edward Lewis Tobinick, MD v. Novella</u>, No. 9:14-cv-80781-RLR (S.D. Fla. Aug. 20, 2015), ECF No. 245.  Thus, even though Dr. Novella had not yet filed his answer, the district court did not abuse its discretion because it properly sought to prevent an undue delay caused by the Tobinick Appellants' last-minute attempts to amend their complaint.

## III.    The Tobinick Appellants' Discovery-Related Requests for Relief

The Tobinick Appellants argue that the district court abused its discretion in not granting relief under Rules 37, 56(d), and 60(b) because Dr. Novella misled the Tobinick Appellants and the district court through his deposition testimony, thereby prejudicing the Tobinick Appellants by an unfavorable summary judgment ruling.

Under Rule 60(b), a party may move for relief from a final judgment or order, for reasons including fraud.  Fed. R. Civ. P. 60(b).[11]  The moving party must show "by clear and convincing evidence that an adverse party has obtained the verdict through fraud, misrepresentation, or other misconduct."  Cox Nuclear Pharmacy, 478 F.3d at 1314 (quoting Frederick v. Kirby Tankships, Inc., 205 F.3d 1277, 1287 (11th Cir. 2000)).

Under Rule 37(b)(2), a party may move for sanctions for failure to comply with a discovery order.  Fed. R. Civ. P. 37(b)(2).  A district court has broad discretion in applying these sanctions, and "a default judgment sanction," as requested by the Tobinick Appellants, "requires a willful or bad faith failure to obey a discovery order."  Malautea v. Suzuki Motor Co., 987 F.2d 1536, 1542 (11th Cir. 1993).

Rule 56(d) provides: "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:  (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d).

---

[11] Because the Tobinick Appellants did not specify the grounds on which they were moving, the district court reasonably construed the basis as for "fraud . . . , misrepresentation, or misconduct by an opposing party."  Edward Lewis Tobinick, M.D. v. Novella, No. 9:14-cv-80781, 2015 WL 11254727, at *1 (S.D. Fla. Sept. 15, 2015) (quoting Fed. R. Civ. P. 60(b)(3)).  On appeal, the Tobinick Appellants do not challenge the district court's construction.

First, to support his requests for Rules 37 and 60(b) relief, the Tobinick Appellants allege a scheme to ruin Dr. Tobinick perpetrated by Dr. Novella and other co-conspirators, but none of his claims are sufficient to demonstrate bad faith or fraud justifying sanctions or reconsideration. Dr. Novella explained each of the alleged false statements in his deposition. As to his communications with the author of the Los Angeles Times article, Dr. Novella testified that at the time of the deposition he did not remember a brief email conversation that had occurred more than two years prior. And, Dr. Novella explained that he truthfully answered his reasonable interpretation of the questions regarding his communications with Ingraham and Barrett.[12] The Tobinick Appellants' conjecture of an elaborate conspiracy is not sufficient to controvert Dr. Novella's reasonable explanations and certainly is insufficient to demonstrate bad faith or fraud. It, consequently, was not an abuse of discretion for the district judge to deny the motions under Rules 37 and 60(b).

Second, the district court did not abuse its discretion on the Rule 56(d) issue as the Tobinick Appellants never made a proper motion for Rule 56(d) relief. "A request for a court order must be made by motion." Fed. R. Civ. P. 7(b)(1).

---

[12] Specifically, Dr. Novella's declaration provided that his deposition did not contain false statements because (1) as to Ingraham, he was asked if he discussed the topic of Dr. Tobinick with Ingraham, but the emails show one-sided emails from Ingraham to Dr. Novella, but did not contain responses from Dr. Novella, and (2) as to Barrett, he answered that he could not recall whether or not an email exchange took place and therefore never falsely denied the existence of such emails in his deposition.

Instead, the Tobinick Appellants requested Rule 56(d) relief in their brief responding to Dr. Novella's motion for summary judgment. The district court did not issue an order regarding Rule 56(d), likely because it was not moved to do so. Indeed, the Tobinick Appellants had once before sought relief pursuant to Rule 56(d) by motion pending the close of discovery, and the district court both considered and ultimately granted the motion. To the extent that the Tobinick Appellants' request for Rule 56(d) relief is premised on the same discovery-related abuses as their other two motions, their claim fails because for the reasons already stated the district court did not abuse its discretion. Thus, the district court did not abuse its discretion in denying each of the Tobinick Appellants' discovery-related requests for relief.

## IV.    The Tobinick Appellants' Lanham Act Claim

The Tobinick Appellants argue that the district court erred in granting summary judgment against them on their Lanham Act claim because there are material facts in dispute regarding the commercial nature of Dr. Novella's speech, chiefly as it relates to his economic motivations. The Tobinick Appellants further contend that Dr. Novella's statements are false and misleading and that the Tobinick Appellants have satisfied the remaining elements of a Lanham Act claim.

The Lanham Act prescribes liability for false advertising to "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). Commercial advertising or

25

promotion includes "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services[;]" and (4) "the representations . . . must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." Suntree Techs., Inc. v. Ecosense Int'l, Inc., 693 F.3d 1338, 1349 (11th Cir. 2012) (quoting Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics, 859 F. Supp. 1521, 1535–36 (S.D.N.Y. 1994)).

Commercial speech is "expression related solely to the economic interests of the speaker and its audience." Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 561 (1980). The "core notion" of commercial speech extends to speech that proposes a commercial transaction. Bolger v. Young Drug Prods. Corp., 463 U.S. 60, 66 (1983). The Supreme Court has identified three factors in looking beyond the core notion of commercial speech: (1) that the material was "conceded to be advertisements," (2) it contained a "reference to a specific product," and (3) the speaker "has an economic motivation" for distributing the material. Id. No one factor is dispositive. See id. at 67. "The combination of all three characteristics, however, provides strong support for the . . . conclusion that the [material is] properly characterized as commercial speech." Id. at 62, 67. But, "speech is not rendered commercial by the mere fact that it

26

relates to an advertisement." Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 384 (1973).

There is no genuine dispute of material fact regarding whether Dr. Novella's articles are commercial speech. A plain reading of the first and second articles makes clear that they do not fall within the core notion of commercial speech as they do not propose a commercial transaction. Instead, Dr. Novella's articles evoke many characteristics of noncommercial speech. The articles "communicate[] information, express[] opinion, [and] recite[] grievances, . . . ." See Sullivan, 376 U.S. at 266. Dr. Novella, who posted the articles on SBM's blog, states in his second article that the purpose of the SBM blog is to "provide an objective analysis of questionable or controversial medical claims so that consumers can make more informed decisions . . . ." Am. Compl. Ex. 5 at 1. The content of the articles corroborates this stated educational purpose, as the articles discuss the plausibility of Dr. Tobinick's practices in relation to the different medical conditions treated, the way etanercept works, and the shortage of medical studies supporting Dr. Tobinick's position. These articles, which conclude that Dr. Tobinick's perispinal administration of etanercept is ineffective, add to the public debate regarding the viability of a non-FDA approved medical treatment and are clearly of import to the public.

We turn next to the three factors outlined by the Supreme Court in Bolger with regard to non-core commercial speech and conclude that these factors do not save the Tobinick Appellants' Lanham Act claim.  First, the Novella Appellees do not concede that the articles are advertisements, nor can they reasonably be construed as such.  The first article makes no mention of Dr. Novella's practice or medical services.  Although the second article does make such a mention, it was authored in response to the Tobinick Appellants' filing of their lawsuit, criticizes the lawsuit as an attempt to suppress Dr. Novella's critiques, and mentions Dr. Novella's medical practice only to provide context regarding the lawsuit.  In addition, Dr. Novella clarifies in his second article that he primarily treats headaches, thereby distancing the types of medical services he provides from the services marketed by Dr. Tobinick, who does not claim to treat headaches.

Second, the articles do not discuss any products for sale by Dr. Novella, and, as discussed, only briefly mention his practice for context.  The articles' sole reference to a product is found in their discussion of Dr. Tobinick's medical treatments.  But, these references to Dr. Tobinick's medical treatments are, by themselves, insufficient to subject Dr. Novella's otherwise protected speech to Lanham Act liability.  See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 761–62 (1976) (explaining that speech that includes content on commercial topics is not automatically commercial speech).  In Gordon

28

& Breach Sci. Publishers S.A., the district court explained that "a restaurant or movie review or a . . . product report" on its own is not commercial speech under the Lanham Act, 15 U.S.C. § 1125(a), but can be transformed into commercial speech when, for instance, a restaurant "posts the . . . review in its window." 859 F. Supp. at 1544. Dr. Novella's discussion of Dr. Tobinick's use of etanercept, which resembles a medical peer review of a treatment's viability, therefore, does not render the articles commercial speech.

Third, the Tobinick Appellants have not demonstrated economic motivation sufficient to transform Dr. Novella's speech into commercial speech. As a preliminary matter, there is no factual dispute as to where the articles were displayed online, how the websites were set up, and whether the websites generated revenue through advertisements and membership subscriptions. The Tobinick Appellants describe a complex "funneling" scheme to generate profit for Dr. Novella, in which the Tobinick Appellants claim that the two articles are connected to other websites through hyperlinks in a way that readers are directed to websites that generate revenue for Dr. Novella, such as through advertising or membership subscriptions.[13] This funneling theory, which attempts to connect the

---

[13] The Tobinick Appellants argue that the court should consider the "full context" of the "interrelated websites, promotion and links that funnel money directly to [Dr.] Novella." But, much of the "full context" the Tobinick Appellants implore us to now consider are merely the websites and factual allegations that the Tobinick Appellants sought to add to their complaint by moving for leave to amend. Because we determined above that the district court did not abuse its

(continued . . . )

29

articles to revenue sources, relies on such a level of attenuation that it fails to demonstrate economic motivation in the commercial speech context.

The Tobinick Appellants' reliance on World Wrestling Federation Entertainment, Inc. v. Bozell is misplaced. 142 F. Supp. 2d 514, 525 (S.D.N.Y. 2001). There, a wrestling organization sued a council comprising concerned parents who had initiated a public attack campaign about the risk to children of portraying violence in wrestling television programs. Id. at 521. The district court denied a motion to dismiss the complaint and held that the allegations were sufficient to demonstrate that the council engaged in commercial speech because it featured the attacks "prominently in a fundraising video," in "fundraising letters," and in order "to raise the profile of [the council]." Id. at 525, 526. Unlike the speech in Bozell, Dr. Novella's articles are neither featured prominently in fundraising efforts[14] (or other similar solicitations for money), nor have the Tobinick Appellants shown that these articles are the central content driving advertising or membership-based revenue.

---

discretion in denying leave to amend, we limit our review, as we must, to the allegations included in the operative amended complaint.

[14] To the extent that the Tobinick Appellants argue that SGU's legal defense webpage sought donations, as discussed, the allegations regarding that webpage are not under review as they were not made in the operative amended complaint.

30

To be sure, neither the placement of the articles next to revenue-generating advertising nor the ability of a reader to pay for a website subscription would be sufficient in this case to show a liability-causing economic motivation for Dr. Novella's informative articles.  Both advertising and subscriptions are typical features of newspapers, whether online or in-print.  But, the Supreme Court has explained that "[i]f a newspaper's profit motive were determinative, all aspects of its operations—from the selection of news stories to the choice of editorial position—would be subject to regulation if it could be established that they were conducted with a view toward increased sales.  Such a basis for regulation clearly would be incompatible with the First Amendment." Pittsburgh Press, 413 U.S. at 385.

Furthermore, as our sister circuits have recognized, magazines and newspapers often have commercial purposes, but those purposes do not convert the individual articles within these editorial sources into commercial speech subject to Lanham Act liability.  See Farah v. Esquire Magazine, 736 F.3d 528, 541 (D.C. Cir. 2013) (holding that a satirical article about a book in a magazine's online blog was not commercial speech subject to Lanham Act liability even though "writers write and publishers publish . . . for commercial purposes"); Hoffman v. Capital Cities/ABC, Inc., 255 F.3d 1180, 1186 (9th Cir. 2001) ("A printed article meant to draw attention to the for-profit magazine in which it appears, however, does not

31

fall outside of the protection of the First Amendment because it may help to sell copies."). We agree. Even if Dr. Novella receives some profit for his quasi-journalistic endeavors as a scientific skeptic, the articles themselves, which never propose a commercial transaction, are not commercial speech simply because extraneous advertisements and links for memberships may generate revenue. See Va. State Bd. of Pharmacy, 425 U.S. at 761 ("Speech . . . is protected . . . even though it may involve a solicitation to purchase or otherwise pay or contribute money."); see also Burstyn v. Wilson, 343 U.S. 495, 501 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment."). Thus, because the articles are not commercial speech, they cannot be subject to Lanham Act liability as commercial advertising or promotion. Accordingly, we need not reach the other elements of a prima facie Lanham Act false advertising action.

## CONCLUSION

For all of the reasons stated above, the judgment of the district court is

**AFFIRMED.**

32